**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **GARETH ALEXANDER BARAN,** | ) | |
| | ) | **PUBLISH** |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION 07-0125-WS-M** |
| | ) | |
| **SUSAN ELIZABETH BEATY,** | ) | |
| | ) | |
| **Respondent.** | ) | |

**ORDER**

This action is before the Court on the Petition for the Return of Child to Petitioner Pursuant to the Hague Convention on the Civil Aspects of International Child Abduction and the International Child Abduction Remedies Act (doc. 1).  On March 22, 2007, a final evidentiary hearing was conducted on the Petition, with both sides being afforded a full, unfettered opportunity to present evidence and argument in support of their respective positions.[1]  The Petition is now ripe for disposition.

**I.      Findings of Fact.**

  *A.      The Parties' Dealings in Australia.*

Petitioner Gareth Alexander Baran ("Baran"), an Australian national, cohabited with respondent Susan Elizabeth Beaty ("Beaty"), a United States citizen from Daphne, Alabama, in a

---

[1]      The hearing setting was announced in open court on February 23, 2007.  (*See* doc. 10.)  As such, both parties received four weeks notice of the scheduled hearing date and time.  Despite this advance notice, petitioner failed to attend or testify at the hearing; rather, his participation was confined to an affidavit dating back to September 21, 2006 that was, in many respects, not directly relevant to the issues before the Court.  Petitioner's unexplained absence at such a serious proceeding (which he initiated) concerning the fate of his son is troubling, particularly in the face of undisputed evidence that petitioner has the financial wherewithal to be present, that there are no health restrictions that would preclude him from traveling, and that he has neither family nor employment-related commitments that might have rendered it a hardship for him to attend.  Despite the best efforts of his capable counsel at the hearing, the result of petitioner's decision neither to attend nor to furnish an on-point affidavit narrowly tailored to the specific issues of concern in this matter was that much of respondent's evidence went effectively unrebutted, yielding a decidedly one-sided record.  This Court's findings of fact are a reflection of that assymetrical evidentiary submission.

*de facto* relationship in Altona, Victoria, Australia, from October 2001 through August 2006. Their union produced a son, Samuel Aidan Beaty Baran ("Sam"), who was born in Australia on March 11, 2006. This action concerns the immediate future of Sam in the wake of the implosion of his parents' relationship in August 2006.

The almost five years that Baran and Beaty spent living together in Australia were not a happy time. Baran sustained serious and debilitating injuries to his lower extremities in an automobile accident in October 2001, rendering him unable to work or even to care for himself for some time thereafter. Beaty, a registered nurse who had earned her nursing degree at the University of South Alabama, tended to Baran and simultaneously worked long hours in a nursing capacity to support the household financially, including paying Baran's child support obligations for his two children from a previous marriage. Those children, Troy (age 16) and Shaye (age 12), visit and stay with their father on a regular basis with no court supervision.

Money was tight, causing considerable stress for the couple. Baran became depressed and drank heavily, to the point where he was spending $30-$50 per day on alcohol and becoming intoxicated on an almost daily basis. It was not uncommon for Baran to drive an automobile while intoxicated (often to or from the pub or the gambling hall), nor was it unusual for him to pass out after an all-day drinking binge, sometimes with a lit cigarette in his possession. When Baran was drunk, he was violent, unstable and mean, such that he frequently flew into a rage and lashed out at whoever happened to be nearby. His anger was often directed at Beaty. In that regard, Baran would berate Beaty in the foulest of terms, would intimidate her physically, and would on occasion become physically abusive towards her. For example, on one occasion Baran slapped Beaty so hard that she fell to the ground. Another time, Baran screamed at and pushed Beaty in the presence of his daughter, Shaye, frightening and upsetting her. On another occasion while Beaty was quite pregnant with Sam, Baran pinned her between a door and the wall, pushing on the door in a manner that applied intense pressure to Baran's abdomen and risked injury to Baran or her unborn child. Other times, Baran hurled furniture at Beaty and (during her third trimester) smashed the door of the couple's microwave oven in a fit of anger.[2]

_____

[2]       Evidence at the hearing showed that these behaviors were nothing new for Baran. An affidavit from Baran's first wife, Shelley, dated May 1997, reflects that at various times

The arrival of Sam in March 2006 did nothing to temper these behaviors in Baran.  Quite the contrary, Beaty (who was on maternity leave from her nursing job from February 2006 through August 2006) found that this development exacerbated Baran's alcohol abuse and intensified his anger; indeed, Baran's demeanor and conduct had begun deteriorating markedly even in Beaty's third trimester.  Baran commenced drinking all day every day, and participated only minimally in Sam's care and supervision.[3]

Baran in no way muted his erratic, volatile and abusive conduct in the presence of his newborn son.  In fact, he endangered Sam on more than one occasion.  One cold March night when Sam was less than a week old, Baran became highly intoxicated and decided he wanted to show his drinking companions "how big Sam's balls were," in his words, so he took Sam, undressed him, and carried him out into the evening chill balanced on one hand, before stumbling into a table, sending glassware flying as he did so.  Much more serious were the events of July 13, 2006, when Baran subjected Beaty to a six-hour, expletive-laden barrage of verbal abuse and threats, all while she held Sam in her arms.  On that occasion, Baran screamed to Beaty that he hated her, that she was never going to see Sam or her family again, and that he was going to bash her face in.  To punctuate the threat, Baran repeatedly swung a portable telephone at her head, causing Beaty to fear for her very life.  Throughout this ordeal, she held Sam and attempted to use her body to shield the infant from his father's rage.  For his part, Sam remained very quiet, wide-eyed and still as he did on the many occasions when Baran became enraged in his presence, but he cried out when Baran tore him from Beaty's arms and deposited him on a couch unsupervised.  Despite these incidents of endangerment, there was no evidence that Baran had ever beaten or otherwise physically harmed Sam.

Baran made it very clear in his alcohol-fueled tirades to Beaty that he did not want Sam.  Indeed, at various times Baran told Beaty in pointed terms that she had "tricked" and "trapped"

---

Baran had slapped her, thrown her against the wall, kicked her in the abdomen while wearing heavy work boots, and thrown furniture about the home.

[3]     That is not to say that Baran never engaged in such activities.  Beaty acknowledged, and photographs from that time period established, that there were times when Baran would assist in giving Sam a bottle, bathing him or playing with him; however, such occasions were isolated and infrequent.

him with the pregnancy, that he did not want another child, that Beaty should not blame him if anything happened to Sam, and that she should have gotten an abortion.  Baran informed Beaty that when the child grew older, he would tell Sam that he did not want him.  On at least two occasions, July 31, 2006 and August 16, 2006, in the context of disagreements concerning his family and/or financial matters, Baran told Beaty to "f*** off back to the United States," admonishing her to take Sam with her because Baran did not want him, did not want this anymore, and wanted his freedom.

Based on this course of conduct, Beaty came to fear for her life and Sam's life if they remained in Australia with Baran.  Beaty felt isolated and believed that none of Baran's family could provide any kind of support or intervention necessary to protect her and Sam from Baran's explosive outbursts.[4]  Beaty never went to the Australian police or judicial system for help because she firmly believed those institutions would be unable to protect her.  She never sought legal custody of Sam from any Australian tribunal.  The Court finds that Beaty genuinely believed that she and Sam would be in mortal danger if they continued to live with Baran, and that she likewise believed that no one in Australia was capable of helping or protecting them.

On August 16, 2006, Baran received a large settlement (in an amount exceeding 325,000 Australian dollars, which equates to more than $260,000 in U.S. currency) as a result of his 2001 automobile accident. To celebrate, he immediately purchased a $20,000 boat.  On August 19, the boat was delivered, and the record contains photographs of Baran, Beaty, Troy and Shaye

---

[4]      In that regard, Beaty testified that Baran's mother is an alcoholic and a compulsive gambler who rebuked Beaty for her selfishness and the "bad timing" of her pregnancy, told her that she should have had an abortion, and unequivocally stated that she (Baran's mother) was "done with the grandmother thing," such that she had little interest in Sam. Baran's father is an alcohol abuser who could not or would not intervene to protect Sam. Baran's sister, Lisa, is a responsible and capable person, but she held little sway over her brother; in fact, it was a desperate call from Beaty to Lisa requesting intervention that inflamed the July 13 ordeal in which Baran terrorized Beaty for six hours.  At that time, Lisa agreed with Beaty that Baran would probably kill her for having appealed to Lisa, but indicated that it was really none of her (Lisa's) business.  Thus, it is clear that Lisa was unable or unwilling to exert control or meaningful influence over Baran.  And Baran's two best friends, Andy Williams and Paul Dwyer, were primarily drinking buddies or "mates" of his, and made no attempt to intercede when they witnessed Baran conducting himself in an abusive or irresponsible manner towards his family.

smiling aboard the boat.  But looks were deceiving.  The next afternoon, Baran came home from an errand to find a note in Beaty's handwriting reading, "Hey Babe, Went for a walk be back later. [Heart] Susie & Boo Boo."  ("Boo Boo" was Beaty's pet name for Sam.)  The hour grew later and still Beaty and Sam did not return home, prompting Baran and his friend, Andy Williams, to launch a frantic search.  Baran contacted the police and completed a missing persons report.  Late that night, the police informed Baran that Beaty and Sam had been located, but that they were presently aboard an airplane bound for the United States.[5]  Baran did not follow them to the United States and, to this day, has had no further face-to-face contact with Beaty or Sam, although there have been numerous telephone calls between Baran and Beaty in the interim.[6]

> **B.   Post-August 2006 Events.**

From August 20, 2006 until the present, Beaty and Sam have continuously resided with Beaty's parents in Daphne, Alabama.  Sam, who was five months old when he arrived in America, quickly accepted female members of Beaty's family, but was much more withdrawn in the presence of men.  It took approximately six weeks before Sam's demeanor changed and he became noticeably happier and comfortable around males in the Beaty family.  For her part, Beaty is adamant that she will never return to Australia again under any circumstances because she fears that Baran will do physical violence to her if she does.

Beaty and Sam's arrival in the United States touched off a spate of legal proceedings, of which this action is simply one component.  On September 5, 2006, Beaty filed a Petition for

---

[5]      When asked to explain why she had intentionally deceived Baran about her whereabouts and intentions on August 20, 2006, Beaty testified that she was in fear for her life and she was afraid of what Baran might do if he knew they were leaving the country.  Such comments are inconsistent with Beaty's rationalization that she was simply doing what he told her to do.  Had she honestly believed that she was simply carrying out Baran's wishes, surely Beaty would not have felt the need to conceal her actions from Baran in that manner.  It is perfectly clear to the Court that Beaty engaged in this deception because she knew that Baran did not want her to leave the country with Sam.

[6]      Beaty surreptitiously tape-recorded a number of those telephone conversations without Baran's knowledge, and those tapes (and the transcripts of same) are part of the record in these proceedings.  No objection was made to the admission of said recordings and transcripts.

Protection from Abuse in the Circuit Court of Baldwin County, Alabama, seeking an award of temporary custody of Sam, as well as an injunction prohibiting Baran from removing Sam.  In her sworn Petition, Beaty did not allege that Baran had injured her or abused Sam, but she did indicate that Baran had attempted to injure her, had threatened to injure her and had made her afraid that she would be seriously injured.  Beaty's Petition also contained a candid admission that Baran was "very angry at [her] for leaving."  The Court's understanding is that no action has been taken on the Baldwin County Petition to date because of delays in perfecting service on Baran in Australia.

For his part, Baran did not stand idly by, either.  On September 21, 2006, Baran submitted to the Australian Central Authority an "Application for the Return of a Child," pursuant to the Hague Convention on the Civil Aspects of International Child Abduction (the "Convention"), wherein he sought the return of a child wrongfully removed or retained from Australia.  This Application stated that Beaty had removed Sam to the United States without Baran's consent, and requested that Sam be returned to him immediately.  In particular, Baran's Application stated as follows under the heading "proposed arrangements for return of the child":

> "The child should be returned forthwith to me at the family home in Altona, Victoria Australia.  I would like the mother to return with the child.  As I am unemployed, I am unable to cover the costs associated with their travel.  I am willing to meet the child at the Melbourne Airport upon arrival.  If the [mother] does not return I am able to look after the said child alone."[7]

(Petitioner's Exh. 1, at 4.)  Neither Baran's Application nor any evidence offered in this matter proposes any alternative arrangements for the return of Sam other than those set forth in Baran's initial Application.

On February 16, 2007, Baran followed up on his Application by filing his Petition in this District Court.  That day, the undersigned entered an Order (doc. 5) denying Baran's request for an Ex Parte Temporary Restraining Order and setting the matter for hearing on the TRO request,

---

[7]     The last sentence of the quoted paragraph appears to contain a typographical error.  As written in the Application, the response states, "If the ***mother's child*** does not return I am able to look after the said child alone."  (Petitioner's Exh. 1, at 4 (emphasis added).)  The phrase "mother's child" does not make sense in that context; rather, Baran could only have meant that if the mother (Beaty) did not return, then he would look after Sam himself.

with notice to respondent, on February 23, 2007.  Counsel for both sides appeared at the

February 23 hearing, and announced that they had reached an agreement for the terms of a

preliminary injunction to restrict Sam's movement during the pendency of these proceedings.

Accordingly, on that date the Court entered an Order (doc. 10) memorializing the parties'

stipulated preliminary injunction and setting the matter for a final evidentiary hearing on March

22, 2007, which hearing was conducted as scheduled.[8]

III.    **Conclusions of Law.**

        *A.*        *The International Child Abduction Remedies Act.*

The International Child Abduction Remedies Act, 42 U.S.C. §§ 11601 et seq.

("ICARA"), implementing the Hague Convention on the Civil Aspects of International Child

Abduction, T.I.A.S. No. 11,670, 1343 U.N.T.S. 89 (Oct. 25, 1980), entitles a person whose child

has been wrongfully removed to, or wrongfully retained in, the United States, usually by a

parent, to petition a federal court to order the child returned.  42 U.S.C. § 11603(b).[9]  "The

Convention's procedures are not designed to settle international custody disputes, but rather to

restore the status quo prior to any wrongful removal or retention, and to deter parents from

engaging in international forum shopping in custody cases."  *Karkkainen v. Kovalchuk*, 445 F.3d

280, 287 (3rd Cir. 2006); *see also Gitter v. Gitter*, 396 F.3d 124, 129 (2nd Cir. 2005) (emphasizing

that the Convention's primary concern is with an abductor's use of force to establish artificial

jurisdictional links on an international level in order to obtain custody of a child); *Van Driessche*

_____

[8]        In ruling on this Petition at this time, the Court proceeds in recognition of Article
11 of the Convention, which requires judicial authorities of contracting states to act
expeditiously in proceedings for the return of children, and generally provides that a judicial
authority should decide a petition within six weeks from the date of commencement of the
proceedings.  *See Elyashiv v. Elyashiv*, 353 F. Supp.2d 394, 396 n.2 (E.D.N.Y. 2005)
(recognizing that issue of repatriation of children under Convention should be decided as
expeditiously as possible).  Baran filed his Petition in this District Court on February 16, 2007,
so this Order falls within the Convention's requisite six-week window.

[9]        The United States ratified the Convention in November 1986 and, in November
1988, President Reagan issued a Proclamation that the Convention had entered into force for the
United States on July 1, 1988 and that it must be observed and fulfilled in good faith by the
United States and its citizens thereafter.  ICARA was enacted during the same year to implement
the Convention.

*v. Ohio-Esezeoboh*, 466 F. Supp.2d 828, 841 (S.D. Tex. 2006) (Convention's drafters sought international cooperation regarding the return of children wrongfully taken by a parent from one country to another in search of a more sympathetic court).  Importantly for purposes of the instant Petition, "[a] court considering an ICARA petition has jurisdiction to decide the merits only of the wrongful removal claim, not of any underlying custody dispute." *Lops v. Lops*, 140 F.3d 927, 936 (11th Cir. 1998); *see also Friedrich v. Friedrich*, 78 F.3d 1060, 1063 (6th Cir. 1996) ("a court in the abducted-to nation has jurisdiction to decide the merits of an abduction claim, but not the merits of the underlying custody dispute").

"The Convention establishes a strong presumption favoring return of a wrongfully removed child." *Danaipour v. McLarey*, 286 F.3d 1, 13 (1st Cir. 2002).  Accordingly, once a petitioner establishes that a wrongful removal or retention has occurred, the child must be repatriated unless the respondent establishes that any of the Convention's affirmative defenses apply.  *See Lops*, 140 F.3d at 945; *see also In re Kim*, 404 F. Supp.2d 495, 511 (S.D.N.Y. 2005) ("If a petitioner makes out a *prima facie* case of wrongful removal or retention, the court must return the child unless the respondent can establish one of the Convention's enumerated defenses.").  The exceptions relevant to this proceeding are set forth in Article 13 of the Convention, which provides, *inter alia*, that a court is not bound to order the return of a wrongfully removed or retained child (although it may do so, in its discretion) if the petitioner consented to or acquiesced in such removal or retention, or if returning the child would pose a grave risk of exposing him to physical or psychological harm or otherwise place the child in an intolerable situation.[10]  "The respondent must prove the defense of consent or acquiescence to the removal or retention by a preponderance of the evidence, or the defense of a grave risk of harm by clear and convincing evidence." *Baxter v. Baxter*, 423 F.3d 363, 368 (3rd Cir. 2005). These defenses are narrowly construed to effectuate the Convention's purposes.  *Id.*; *see also*

---

[10]     To be clear, a court has the discretion to grant an ICARA petition even if one of the Convention's exceptions is proven.  In that regard, the Sixth Circuit observed that "a federal court retains, and should use when appropriate, the discretion to return a child, despite the existence of a defense, if return would further the aims of the Convention." *Friedrich*, 78 F.3d at 1067; *see also Miller v. Miller*, 240 F.3d 392, 402 (4th Cir. 2001) (courts retain discretion to order child's return even if one of the Convention's exceptions is proven).

*Danaipour*, 286 F.3d at 14 ("Exceptions to the general rule of expedient return, including Article 13(b), are to be construed narrowly."); *Kim*, 404 F. Supp.2d at 512 (declaring that Convention's affirmative defenses are meant to be narrow, inasmuch as broad construction would frustrate core purpose of Convention).

> **B.      Wrongful Removal or Retention.**

Pursuant to ICARA, Baran bears the initial burden of establishing by a preponderance of the evidence that Sam "has been wrongfully removed or retained within the meaning of the Convention."  42 U.S.C. § 11603(e)(1)(A).  The Convention provides that a child's removal or retention is wrongful if "it is in breach of rights of custody attributed to a person ..., either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention," and if the petitioner was actually exercising those rights at that time.  Hague Convention, art. 3, T.I.A.S. No. 11,670; *see also Friedrich*, 78 F.3d at 1064 (person can invoke Convention to secure return of child to country of habitual residence if he proves by a preponderance of the evidence that he was exercising custody rights to the child under that country's law).

As stipulated at the outset of the March 22 hearing, all parties agree that Sam was habitually resident in Australia immediately before his removal in August 2006 and that such removal was in breach of Baran's custody rights under Australian law that he was actually exercising at the time.[11]  In short, then, as Beaty has stipulated to Baran's ability to establish by a preponderance of the evidence that Sam has been wrongfully removed or retained within the meaning of the Convention, petitioner has unquestionably satisfied his burden of proof under 42 U.S.C. § 11603(e)(1)(A), and the burden shifts to respondent to prove the existence of one of the

_____

[11]      Such stipulations were entirely prudent under the circumstances, and served to streamline the proceedings and save Baran the trouble of proving elements that he unquestionably could prove.  In that regard, it is plain from the evidence that Sam had habitually resided with his parents in Australia for his entire life until August 20, 2006, and that Baran possessed legal custody rights as to Sam which he was actually exercising at the time of Sam's departure.  *See generally Sealed Appellant v. Sealed Appellee*, 394 F.3d 338, 343 (5th Cir. 2004) ("In the absence of any orders of court, each Australian parent of a child has custody rights as to the child.").  These stipulations enabled the Court and the parties to focus on the true issues of concern – namely, the consent and grave risk exceptions – without becoming bogged down in a threshold inquiry whose outcome was not in doubt.

four narrow defenses permitted by the Convention.[12]  Beaty contends that the Petition is due to be denied under the Convention-sanctioned exceptions of consent and grave risk.

## C.    Consent or Acquiescence Exception.

Article 13(a) of the Convention establishes that a court need not order the return of a child if the petitioner "had consented to or subsequently acquiesced in the removal or retention." *Id.*  Pursuant to ICARA, a respondent seeking to avoid repatriation of a wrongfully removed or retained child under Article 13(a) must prove that defense by a preponderance of the evidence. *See* 42 U.S.C. § 11603(e)(2)(B).  In examining this defense, courts have found an analytical distinction between consent and acquiescence, either of which may suffice to defeat an ICARA petition under appropriate circumstances.  In particular, "[t]he consent defense involves the petitioner's conduct prior to the contested removal or retention, while acquiescence addresses whether the petitioner subsequently agreed to or accepted the removal or retention." *Baxter*, 423 F.3d at 371.  The Court will consider each of these possibilities separately.

A respondent attempting to prove the defense of acquiescence must demonstrate the presence of "an act or statement with the requisite formality." *Baxter*, 423 F.3d at 371 (quoting *Friedrich*, 78 F.3d at 1070.  In that regard, the threshold of formality necessary to establish "subjective acquiescence can be shown by a preponderance of the evidence pointing to (1) a formal act or statement (e.g., testimony in a judicial proceeding); (2) a convincing written statement; or (3) a persuasive acquiescent attitude over a significant period of time." *In re Leslie*, 377 F. Supp.2d 1232, 1247 (S.D. Fla. 2005) (observing that petitioner's relentless pursuit of exercising rights of custody through legal channels in Belize and United States is inconsistent with a finding of acquiescence); *see also Baxter*, 423 F.3d at 371 (similar).  The touchstone of the analysis is the petitioner's subjective intent; indeed, "the acquiescence inquiry turns on the subjective intent of the parent who is claimed to have acquiesced." *Baxter*, 423 F.3d at 371 (citations omitted).

Beaty has made no showing even approaching the formality necessary to invoke the

---

[12]    *See Friedrich*, 78 F.3d at 1067 (reciting defenses as including untimeliness, consent, grave risk, and violation of fundamental principles relating to protection of human rights and fundamental freedoms).

Article 13(a) defense to Sam's repatriation.  There is neither evidence nor suggestion that Baran ever renounced his rights to Sam's custody via testimony in a judicial proceeding or a convincing written statement.  Nor has Beaty shown any consistent acquiescent attitude on Baran's part; to the contrary, the record reflects that Baran commenced attempting to secure Sam's return both informally (through numerous telephone conversations with Beaty in which he pleaded for their return) and formally (through his Application in Australia invoking the Convention within a month of Sam's departure) shortly after Sam arrived on United States soil. If, as the case law has held, acquiescence focuses on a petitioner's post-removal behavior, then nothing in Baran's conduct after August 20, 2006 would suggest that he acquiesced after the fact to Sam's wrongful removal or retention for even a moment, much less that he did so consistently over a significant time period.  *See generally Whallon v. Lynn*, 230 F.3d 450, 461 n.13 (1st Cir. 2000) (explaining that cases in which courts have upheld acquiescence defense "have all involved clear instances of waiver by the party seeking the child's return").

As such, Beaty's Article 13(a) defense turns on her ability to establish consent.  "Consent need not be expressed with the same degree of formality as acquiescence."  *Baxter*, 423 F.3d at 371.  Nonetheless, that defense is likewise focused on the petitioner's subjective intent.  *Id.*; *see also Kim*, 404 F. Supp.2d at 516 ("The key to the consent inquiry is the petitioner's subjective intent, including the nature and scope of the alleged consent.").  "In examining a consent defense, it is important to consider what the petitioner actually contemplated and agreed to in allowing the child to travel outside its home country."  *Baxter*, 423 F.3d at 371.  Accordingly, the appropriate formulation for the consent defense is that the respondent must prove by a preponderance of the evidence that the petitioner harbored a subjective intent to permit the respondent "to remove *and* retain the child for an indefinite or permanent time period."  *Kim*, 404 F. Supp.2d at 516.  A petitioner's conduct following the removal of the child may be beneficial in ascertaining whether such consent had been provided at the time of removal.  *See Gonzalez-Caballero v. Mena*, 251 F.3d 789, 794 (9th Cir. 2001).

As evidence of consent, Beaty proffers her own testimony that on two occasions (July 31, 2006 and August 16, 2006), Baran told her in coarse terms to go back to the United States and to take Sam with her.  Although Beaty insists that Baran was not intoxicated when he made such remarks, her testimony reflects that these statements arose in the context of disagreements

between the parties on a variety of topics, such that Baran was agitated, upset and distracted.  For his part, Baran stated in his September 21 Affidavit that at no time had he ever agreed to Beaty taking Sam to the United States or remaining there.  (Petitioner's Exh. 2, ¶ 36.)[13]  From observing Beaty's demeanor on the witness stand, the Court finds her testimony on this point to be credible; therefore, it is this Court's determination as a factual matter that Baran did angrily tell Beaty on two occasions to go back to the United States and to take Sam with her.

But a factual finding that Baran uttered these words does not necessarily equate to a legal determination that Baran consented for purposes of Article 13(a).  As mentioned *supra*, that

---

[13]     To corroborate her account, Beaty offered transcripts of telephone conversations in October and November 2006, during which Baran pleaded with Beaty to return to Australia with Sam, professed his love for both of them, and entreated her to give their relationship another chance.  During those calls, respondent argued, Baran ostensibly admitted to telling Beaty to take Sam to the United States; however, these transcripts are ambiguous at best.  To be sure, there are exchanges which appear to support Beaty's account, such as one in which Beaty asked why he had told them to leave, and Baran responded, "Susie, I didn't mean that." (Respondent's Exh. 10, at 2.)  In several other places in those transcripts, however, Baran (who was unaware that Beaty was recording the calls) either expressly denied having told Beaty to take Sam to the United States, or indicated that if he had made such a statement he did not recall it.  (*See* Respondent's Exh. 9, at 17; Respondent's Exh. 10, at 4, 9; Respondent's Exh. 11, at 10, 16.)  As an example, one passage culled from the November 11, 2006 transcript and not mentioned by either side during the hearing was chock full of denials by Baran that he had ever told Beaty to take Sam away, as follows:

"S:     You told me to go.  You said you didn't want me and you didn't want him.
"G:     Did not.
"S:     Yes you did.
"G:     Did not, you snuck off Susie, in the worst possible way.
"S:     Gareth, you told me to take him and to leave.
"G:     You snuck off Susie.
"S:     You told me to take him and you told me to leave.
"G:     How could you do that to somebody, really?
"S:     Because you told me to do it.
"G:     No, I didn't."

(Respondent's Exh. 10, at 10.)  The point is that, contrary to respondent's representations during the hearing, these transcripts contain multiple instances in which Baran specifically denies having consented to Beaty's removal of Sam.  For that reason, the transcripts do not substantially corroborate or assist Beaty's efforts to satisfy her evidentiary burden.

inquiry turns on Baran's subjective intent.  Notwithstanding whatever words Baran might have spoken in a fit of anger (alcohol-fueled or otherwise) in the context of a stressful, emotional discussion, the preponderance of the evidence does not reflect that Baran subjectively intended to authorize Beaty to remove Sam from Australia and to retain him in the United States indefinitely or permanently.  The argumentative context in which the words were spoken does not suggest that Baran was acting in a thoughtful manner, or that his words necessarily reflected his true intent.  No one understood this more than Beaty, who proceeded to concoct a subterfuge to deceive Baran as she and Sam made their getaway to America.  Had Beaty believed that Baran truly subjectively intended to consent to their departure, such trickery would hardly have been necessary.[14]  Moreover, the prompt and extensive measures undertaken by Baran after Beaty's departure to bring about Sam's swift and indefinite return to Australia are persuasive evidence that he never subjectively intended to consent to his son's permanent removal and retention in a foreign land.[15]

Where a respondent engages in deception to effectuate a child's removal, and where the petitioner engages in extensive post-removal actions to secure that child's return, such facts militate strongly against a finding of consent.  *See Garcia v. Angarita*, 440 F. Supp.2d 1364, 1380 (S.D. Fla. 2006) ("The evidence of the deception Respondent perpetrated on Petitioner regarding the children's departure, as well as Petitioner's testimony and the actions he took to secure their return under the Hague Convention overwhelmingly supports the finding that he did

---

[14]     In so finding, the Court does not mean to imply that Beaty had no good reason to misrepresent her whereabouts to Baran.  Indeed, she testified that she left the deceptive note for Baran on August 20, 2006 because she feared for her life.  Notwithstanding the validity of her concern and the legitimacy of her motives, Beaty's secrecy and misdirection are telling because they demonstrate that she did not believe that Baran had subjectively intended to consent to Sam's permanent removal from Australia.  If she did not believe it after being present when these conversations occurred, then it is exceedingly difficult for this Court to believe it.

[15]     Beaty would characterize Baran's actions in this regard as mere expressions of regret for having consented to Sam's permanent removal.  It is true that a petitioner's regret of his previously given consent in no way vitiates the validity or force of that consent.  *See Kim*, 404 F. Supp.2d at 519.  But that is not what the evidence shows here.  Far from reflecting that Baran regretted having consented to Sam's permanent removal from Australia, the record in this case reflects that Baran never consented at all.

not consent to their permanent residence in the United States.").  As that is the case here, the Court finds that respondent has failed to carry her burden under § 11603(e)(2)(B) of showing by a preponderance of the evidence that Baran consented to the wrongful removal and retention of Sam in the United States.  Therefore, Beaty cannot rely on the Article 13(a) exception to justify her opposition to the Petition.

### D.   Grave Risk of Harm Exception.

#### 1.   Legal Standard.

The other defense invoked by Beaty is that prescribed by Article 13(b) of the Convention, pursuant to which a court may decline to return a wrongfully removed child if "there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation."  *Id.*  ICARA obliges a respondent invoking Article 13(b) to prove that exception by clear and convincing evidence.  42 U.S.C. § 11603(e)(2)(A).

Contrary to petitioner's assertions during oral argument that domestic violence is not the stuff of grave risk, the Article 13(b) defense is not confined to situations where a child would be returned to a zone of war, famine or disease, but has routinely been construed as applying with equal force to "cases of serious abuse or neglect, or extraordinary emotional dependence, when the court in the country of habitual residence, for whatever reason, may be incapable or unwilling to give the child adequate protection."  *Baxter*, 423 F.3d at 373 (citation omitted); *see also Blondin v. Dubois*, 238 F.3d 153, 162 (2nd Cir. 2001) ("*Blondin II*") ("grave risk" exception applies to situations in which the child faces a real risk of being hurt, physically or psychologically, as a result of repatriation).  Nonetheless, as with other defenses provided by the Convention, the Article 13(b) "grave risk" exception is narrowly drawn to uphold the paramount purpose of this international agreement.  *See In re Application of Adan*, 437 F.3d 381, 395 (3rd Cir. 2006).  Thus, this defense contemplates "something greater than would normally be expected on taking a child away from one parent and passing him to another."  *Flynn v. Borders*, --- F. Supp.2d ----, 2007 WL 144861, *5 (E.D. Ky. 2007) (citations omitted).  "In general, respondents who successfully rely on this exception have alleged sustained physical or psychological abuse directed at the child."  *Flynn*, 2007 WL 144861, at *5; *see also Gaudin v. Remis*, 415 F.3d 1028, 1035 (9th Cir. 2005) (under Article 13(b), "the question is whether the

-14-

child would suffer serious abuse"); *In re D.D.*, 440 F. Supp.2d 1283, 1298 (M.D. Fla. 2006) ("Only severe potential harm to the child will trigger this Article 13b exception.").

Examination of the Article 13(b) "grave risk" affirmative defense is necessarily a fact-intensive determination. *See Sealed Appellant v. Sealed Appellee*, 394 F.3d 338, 346 (5th Cir. 2004). Indeed, this exception "encompasses evaluation of the people and circumstances awaiting that child in the country of her habitual residence. The Court may consider the environment in which the child will reside upon returning to [the country of habitual residence]." *D.D.*, 440 F. Supp.2d at 1299. It is not surprising, then, that the overwhelming majority of the evidence presented by the parties during the five-hour evidentiary hearing held on March 22, 2007 was directed at this question. The Court now turns to this evidence.[16]

> 2.   *Existence of Grave Risk if Sam is Returned to Baran.*

In the Application that he submitted to Australian authorities in September 2006, Baran proposed that Sam be returned forthwith to him at the family home in Altona, Australia.[17] His Application recites his preference that Beaty return with Sam; however, Beaty credibly testified, and the Court expressly finds, that she has no intention of ever returning to Australia under any circumstances because of her fear of reprisals by Baran. As such, any proposed return

---

[16]     In considering the Article 13(b) exception, the Court's role is not to make an anticipatory ruling on child custody, to engage in a "best interests" analysis on Sam's behalf, or to make sweeping pronouncements as to Baran's parental fitness or lack thereof. *See, e.g., Danaipour*, 286 F.3d at 14 ("The Article 13(b) defense may not be used as a vehicle to litigate (or relitigate) the child's best interests."); *Whallon*, 230 F.3d at 459-60 (for purposes of Article 13(b) exception, courts must not "engage in a custody determination or ... address such questions as who would be the better parent in the long run," nor may they "risk substituting a best interest of the child analysis for the analysis the Convention requires"); *Friedrich*, 78 F.3d at 1068 ("The exception for grave harm to the child is not license for a court in the abducted-to country to speculate on where the child would be happiest."). This analysis proceeds in express recognition of these limitations in the context of the instant Petition.

[17]     That section of the Application also includes a disclaimer that, because of his unemployed status, Baran is unable to cover Sam's travel costs back to Australia. Such a representation is clearly false, as it is unchallenged that Baran had access to approximately 290,000 Australian dollars (or $235,000 U.S. at today's exchange rate of $0.81 U.S. per $1.00 Australian) in his bank account at that time. Plainly, Baran was fully capable of footing the travel tab for Sam (and Beaty, if she joined him) without hardship.

arrangement predicated on Beaty accompanying Sam back to Australia is unrealistic, unworkable and will not be ordered by this Court. In the event that Beaty did not return, Baran's Application continued, his proposed arrangement was that he would "look after the said child alone" at his home pending the resolution of any custody proceedings. (Petitioner's Exh. 1, at 4.)

Beaty presented overwhelming evidence at the hearing that Sam would face a grave risk of physical or psychological harm if he were left in Baran's care pending Australian custody proceedings. Respondent's testimony was both compelling and extensive that Baran abuses alcohol on a daily or near-daily basis, that he is susceptible to lengthy drinking and gambling binges that in no way abated during the five months that Sam habitually resided with him, that he is only marginally able to care for his own basic needs, that he has no close family members or friends that could reasonably be expected to have meaningful involvement in Sam's day-to-day care and protection, that he is emotionally unstable and prone to uncontrolled destructive outbursts of rage, that he was physically and verbally abusive toward Beaty in Sam's presence, that he physically endangered Sam (both intentionally and unintentionally) when Sam lived under his roof, and that Baran repeatedly and pointedly stated to Beaty after Sam's birth that he did not want Sam, that Sam should have been aborted, that Sam would die if Sam "became an American", and that Beaty could not blame him if "something happened to" Sam.

Based on this disturbing and sometimes chilling testimony, which the Court credits, the Court readily concludes that Beaty has demonstrated by clear and convincing evidence that Sam would face a grave risk of physical or psychological harm if, as Baran expressly requested in his Application, Sam were placed in his care in Australia pending the outcome of an Australian custody proceeding. This result is consistent with numerous authorities construing ICARA in analogous settings. *See, e.g., Van De Sande v. Van De Sande*, 431 F.3d 567, 570 (7th Cir. 2005) ("given [petitioner]'s propensity for violence, and the grotesque disregard for the children's welfare that he displayed by beating his wife severely and repeatedly in their presence and hurling obscene epithets at her also in their presence, it would be irresponsible to think the risk to the children less than grave"); *Walsh v. Walsh*, 221 F.3d 204, 220 (1st Cir. 2000) ("grave risk" threshold satisfied by evidence that petitioner had demonstrated violent temper with proclivity for physical violence, that such temper and violence were not lessened by the presence of his

-16-

children, that academic research establishes that serial spousal abusers are likely to be child abusers, and that children face increased risks of physical and psychological injury when in contact with spousal abusers); *Blondin v. Dubois*, 189 F.3d 240, 248 (2nd Cir. 1999) ("*Blondin I*") (danger that petitioner would physically harm the children is a consideration that lies at the core of the interests that Article 13(b) was designed to protect); *Didur v. Viger*, 392 F. Supp.2d 1268, 1272 (D. Kan. 2005) (finding that grave risk exception applied where record established that petitioner's home is a dangerous and unfit place to raise a child because of petitioner's neglect of child and emotional instability), *reversed on other grounds*, 2006 WL 2678023 (10th Cir. Sept. 19, 2006); *Elyashiv v. Elyashiv*, 353 F. Supp.2d 394, 408 (E.D.N.Y. 2005) (deeming petitioner's history of spousal abuse and general pattern of violence to be relevant to grave-risk inquiry because of potential that abuser will also abuse the child).

    3.  *Undertakings.*

   As of the close of evidentiary submissions and oral arguments at the March 22 hearing in this matter, it appeared that the Article 13(b) issue joined herein extended no further than an examination of whether a "grave risk" would be triggered by placing Sam in Baran's care pending the conclusion of an Australian child custody battle. Petitioner had proffered no evidence of any other possible arrangements that might be made for Sam's care during that interval if the Petition were granted. Nor had petitioner asserted (either in oral argument or in his accompanying trial brief on the Article 13(b) defense) that any further inquiry or investigation was necessary beyond the narrow question of whether having Baran care for Sam would impose such a grave risk. However, in the waning moments of the hearing, after the close of evidence, after oral arguments were concluded, and after a short recess in which the undersigned decided to take the matter under submission, petitioner's counsel requested "one more bite at the apple" by mentioning, for the first time, the concept of "undertakings." Specifically, petitioner's counsel requested to be given an opportunity, at some future date, to put on evidence of the purportedly "procedural issue" of possible conditions that this Court might impose in order to safeguard Sam upon his return to Australia. Because the March 22 hearing had essentially concluded, and because it was evident that petitioner had no further evidence or argument to present at that time, the Court adjourned the hearing with the caveat that petitioner's "undertakings" request would be reserved for further discussion if necessary.

The case law reflects that, even when confronted with a grave risk of physical harm, certain courts "have allowed the return of a child to the country of habitual residence, provided sufficient protection was afforded." *Walsh*, 221 F.3d at 221. That protection may take the form of "undertakings," or enforceable conditions of return that may be ordered to mitigate the risk of harm occasioned by the child's repatriation. *See Feder v. Evans-Feder*, 63 F.3d 217, 226 (3rd Cir. 1995) ("in order to ameliorate any short-term harm to the child, courts in the appropriate circumstances have made return contingent upon 'undertakings' from the petitioning parent").[18] Undertakings may include such conditions as, for example, ordering the child's return to his country of habitual residence, subject to placement of the child in the temporary custody of a third party (*e.g.*, foster care) in that country until the home country's courts sort out permanent custody issues. The determination of whether any valid undertakings are possible in a particular case is "inherently fact-bound" and is an issue on which the petitioner bears the burden of proof. *Danaipour,* 286 F.3d at 21, 29.

The Court finds two insuperable difficulties to Baran's last-minute attempt to inject the issue of undertakings into this dispute. First, although the Eleventh Circuit has not spoken on this question and the parties addressed it neither in briefs nor in oral arguments, substantial persuasive appellate authority from other jurisdictions supports the proposition that undertakings may be inappropriate in this kind of case. In a recent opinion, the Seventh Circuit expressed profound skepticism at the use of undertakings in cases of abuse. *See Van De Sande*, 431 F.3d at 571-72. In that regard, the *Van De Sande* court cautioned against blind reliance on undertakings in such cases, opining that to place children in the hands of an abusive father "on the ground that they will be protected by the police of the father's country, would be to act on an unrealistic premise." *Id.* at 571. The Seventh Circuit also relied on State Department guidance that where the Article 13(b) exception is satisfied, "it would seem less appropriate for the court to enter extensive undertakings than to deny the return request" because the use of undertakings in that context "could embroil the court in the merits of the underlying custody issues and would tend to

---

[18]     As the First Circuit has explained, "[t]he concept of 'undertakings' is based neither in the Convention nor in the implementing legislation of any nation ... Rather, it is a judicial construct, developed in the context of British family law." *Danaipour*, 286 F.3d at 21 (citation omitted).

dilute the force of the Article 13(b) exception." *Id.* at 1572 (citations omitted). *Van De Sande* also cited with approval the First Circuit's assessment that "undertakings are most effective when the goal is to preserve the status quo of the parties prior to the wrongful removal. This, of course, is not the goal in cases where there is evidence that the status quo was abusive." *Id.* (citing *Danaipour*, 286 F.3d at 25.). The First Circuit's approach is similar, touting the State Department's view that undertakings should be limited in scope, opining that undertakings addressing in detail matters of custody and maintenance appear questionable, and expressing aversion to the unseemliness of a U.S. court issuing orders for a foreign court to enforce, particularly given the specter that the foreign court may not enforce such orders. *Danaipour*, 286 F.3d at 22-23. The *Danaipour* court suggested that undertakings are most appropriate when they are proposals agreed upon by the parties which can be readily presented to a judge in the requesting state, so as to obviate these international comity and transboundary enforcement concerns. *Id.* at 23. Thus, the *Danaipour* court struck down a district court's return order which included undertakings that the district court believed were necessary to protect the children from grave risk, but that were based on the district court's erroneous assumption that Swedish courts would simply copy and enforce those undertakings as given. *Id.* at 25.

Simply put, the critical lesson that the Court derives from the First Circuit, the Seventh Circuit, and the Department of State is that where, as here, "substantial allegations are made and a credible threat exists, a court should be particularly wary about using potentially unenforceable undertakings to try to protect the child." *Danaipour*, 286 F.3d at 26. This is just such a case. There is abundant, credible evidence before the Court that Baran is a violent and abusive man with a lengthy history of inflicting physical and psychological abuse on those he ostensibly loves the most. His volatile personality, his propensity for alcohol abuse and his frequent statements of thinly veiled hatred for Sam and Sam's mother prior to Sam's removal combine to produce a highly combustible powder keg from which this Court is powerless to protect Sam. For this Court blithely to ship Sam back to Australia subject to elaborately crafted, well-meaning conditions that may or may not be enforced or enforceable by an Australian court would be to abdicate its overarching responsibility to protect this child from harm, while simultaneously entangling this Court in custody matters that exceed its authority and jurisdiction. This the Court will not do.

-19-

The Court is well aware of the valid, important policy considerations that demand the Convention's steadfast enforcement by the courts of this country.[19]  Notwithstanding these important international interests, "the safety of children is paramount."  *Van De Sande*, 431 F.3d at 572; *Danaipour*, 286 F.3d at 26 ("the terms of the Convention, as well as the Department of State's guidance, indicate that the protection of the child must remain paramount").  Because the Court finds that Sam is in grave danger of incurring physical or psychological harm if he is returned to Australia, and pursuant to the rationale of the First and Seventh Circuits and the State Department guidance, it is not appropriate to consider undertakings in this case.[20]  To hold

---

[19]     Petitioner's counsel effectively addressed these concerns during oral argument, wherein he emphasized the vital importance of the United States honoring its treaty obligations and being a faithful member of the Convention by returning to their habitual residences children who have been abducted to this country from abroad.  Moreover, the Court is well aware that Congress has made an express legislative determination that international abduction and wrongful retention of children is harmful to children's well-being, that persons should not be able to secure custody of children by virtue of such wrongful removal or retention, that concerted international cooperation is needed to combat the escalating problems of international abductions and retentions of children, and that the Convention provides a sound treaty framework to address these problems.  42 U.S.C. § 11601(a); *see also Walsh*, 221 F.3d at 221-22 (recognizing that international child abduction is a serious problem and that a U.S. court's interpretation of a treaty has consequences not only for the family immediately involved but also for the way in which other courts, both here and abroad, interpret said treaty).

[20]     In reaching this conclusion, the Court acknowledges a lack of uniformity among federal appellate courts on this question.  Indeed, several circuits have remanded denials of ICARA petitions for the district court to conduct wide-ranging fact-finding on the topic of undertakings, even in an Article 13(b) context.  *See, e.g., Blondin I*, 189 F.3d at 248 (declaring that "it is important that a court considering an exception under Article 13(b) take into account any ameliorative measures (by the parents and by the authorities of the state having jurisdiction over the question of custody) that can reduce whatever risk might otherwise be associated with a child's repatriation"); *Gaudin*, 415 F.3d at 1035-37 (similar); *Adan*, 437 F.3d at 395 (similar).  The *Blondin I* court took this approach to an extreme by ordering the district court on remand "to make any appropriate or necessary inquiries of the government of France - especially regarding the availability of ameliorative placement options in France - and to do so, *inter alia*, by requesting the aid of the United States Department of State ...."  189 F.3d at 249.  Such an edict is more than a little disquieting.  District courts are not generally in the business of conducting *sua sponte* interrogations of non-party federal agencies and foreign governments regarding evidentiary matters that the parties could have submitted, but failed to submit, for the court's consideration.  Such investigative forays are generally the exclusive province of the parties.  Accordingly, absent any Eleventh Circuit precedent compelling such an approach, this Court

otherwise would be to contribute to the erosion of the Article 13(b) exception from the Convention in the name of expedience, all the while unacceptably jeopardizing Sam's safety. This Court simply cannot conclude with any degree of confidence that placing even stringent conditions on Sam's return to Australia would effectively insulate him from Baran's wrath and insure his safety.  Even if it could, it is not appropriate for this Court to tell Australian authorities what to do, to assume that Australian authorities can or will enforce conditions imposed by this Court, or to engage itself in managing the minutiae of custody, maintenance, visitation, and other rights of the parties in Australia during the interim of any Australian custody proceedings.

Second, even if it were appropriate to consider undertakings in an Article 13(b) case with facts such as these, the Court would still deny Baran's request to take up that issue now as untimely.  As stated *supra*, petitioner neglected to raise the undertakings issue until the very close of the final evidentiary hearing in this matter, after he had rested, after the record had been closed, and after both sides had concluded their oral arguments.  Even then, petitioner made it clear that he was unprepared to proffer any undertakings evidence at that time, so he was effectively requesting a second evidentiary hearing to be set at some future date, presumably after affording him an opportunity to gather such evidence.  Reopening the record under these circumstances would be inappropriate.  Baran selected the date, time and hour in which these proceedings would be initiated.  He had an additional month thereafter to compile and catalog supporting evidence for the evidentiary hearing, the setting of which was announced far in advance.  Beaty's counsel announced in open court a full four weeks before that hearing that respondent intended to pursue an Article 13(b) defense, thereby placing Baran on notice that undertakings might be relevant to this dispute.  Yet he did not secure any evidence of other workable arrangements or feasible conditions that might be available under the auspices of the Australian government to allow Sam to return to Australia in some other person's care, pending a long-term custody adjudication, so as to mitigate the risk of harm that might otherwise be attendant to granting the Petition.  Nor did petitioner ever seek a continuance of the final hearing on the ground that he required additional time to develop supporting facts for alternative

---

declines both to collect the petitioner's evidence for him and to inject itself into the sphere of international relations and diplomacy in the manner contemplated by *Blondin I.*

arrangements or conditions on return.  Instead, he stood by his original statement in his September 21 Application that if Beaty did not return with the child, Baran intended to care for Sam at Baran's home all by himself pending the resolution of Australian custody proceedings.

    To allow the record to be reopened at this time for Baran to gather and submit evidence in support of an undertakings argument would unacceptably delay these proceedings.  This Court is operating under the admonition of Article 11 of the Convention that a final decision on his Petition should be reached within 6 weeks after this action was commenced.  To allow undertakings evidence now would exceed that treaty-imposed deadline by 100% or more, depending on how long it took to gather such evidence, to afford respondent a reasonable opportunity to conduct discovery on such evidence, and to reset the matter for a supplemental evidentiary hearing.  The interests of justice favor an efficient resolution of disputes without a multiplicity of hearings.  The interests of the parties favor the prompt resolution of this dispute, without subjecting Beaty to the emotional turmoil of further in-court proceedings in which her past decisions and mistakes are exposed in public, causing her to relive the agony and embarrassment of her past in open court even as Baran is nowhere to be found.  The interests of Sam favor the prompt initiation and disposition of custody proceedings between his parents, in whatever forum they may occur, so as to relieve him in an expeditious manner of the awful burden of being the object of a protracted tug-of-war contest between parents whose relationship ended badly.  All of these considerations uniformly militate against stringing out these proceedings any further.[21]  This Court has afforded petitioner a full, fair bite at the apple in litigating his Petition.  He is entitled to no more.  For that reason, his dilatory attempt to litigate the question of undertakings – a fact-based question as to which he bears the burden of proof – will not be countenanced at this time.

**IV.    Conclusion.**

    For all of the foregoing reasons, the Court finds that respondent has shown by clear and convincing evidence that there is a grave risk that ordering Sam to return to Australia would

---

[21]    In so finding, the Court in no way impugns the integrity of petitioner's counsel. There is absolutely no indication that petitioner's counsel's delay in raising this issue was the product of bad faith or an improper motive, and this Court ascribes no such nefarious purpose to the request.

expose him to a grave risk of physical or psychological harm, or otherwise place him in an intolerable situation.[22]  The Petition for the Return of Child (doc. 1) is therefore **denied** pursuant to Article 13(b) of the Convention and 42 U.S.C. § 11603(e)(2)(A).  A separate judgment will enter.  There being no remaining issues to litigate in this action, the Clerk's Office is directed to close this file for statistical purposes.  The stipulated preliminary injunction entered by the Court via Order (doc. 10) dated February 23, 2007 is hereby **dissolved**.

　　　　DONE and ORDERED this 28th day of March, 2007.


　　　　　　　　　　　　　　　　　　s/ WILLIAM H. STEELE_____
　　　　　　　　　　　　　　　　　　UNITED STATES DISTRICT JUDGE

---

[22]　　　The Court recognizes that "even if the conditions for an Article 13(b) exception are met, the Hague Convention gives the court discretion to return the child to the country of habitual residence."  *Danaipour*, 286 F.3d at 14.  Nonetheless, for the many reasons stated *supra* in the context of the grave risk and undertakings analyses, the Court declines to exercise its discretion to repatriate Sam under these circumstances, and expressly concludes that returning Sam to Australia would not further the aims of the Convention.